**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| AARON CISSELL, and BIG STATE AIR CONDITIONING AND HEATING COMPANY, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>DAIKIN COMFORT TECHNOLOGIES NORTH AMERICA, INC., GOODMAN COMPANY, LP.,<br><br>Defendants. | Case No.:<br><br>CLASS ACTION COMPLAINT<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiffs Aaron Cissell and Big State Air Conditioning and Heating Company, individually, and on behalf of all others similarly situated, by and through their counsel, bring this action against Daikin Comfort Technologies North America, Inc. ("Daikin") and Goodman Company, L.P. ("Goodman") (collectively "Defendants"). Plaintiffs' allegations herein are based upon personal knowledge and belief as to their own acts, upon the investigation of their counsel, and upon information and belief as to all other matters.

## INTRODUCTION

1. This action arises from Defendants' deceptive and misleading practices in connection with the design, manufacturing, marketing, and sale of Amana brand air conditioning units.

2. Like many modern high-energy appliances, Amana air conditioning ("AC") units utilize an electrical device called a capacitor. Capacitors are responsible for supplying the electrical jolt to both start the AC units and keep a steady current of electricity to keep them running after startup.

3. The capacitors used by Defendants in their Amana AC units are defective because the dielectric oil used within the capacitor is defective and prone to thinning out prematurely, which causes the capacitors to be unable to hold a charge (the "Defect"). Once the Defect manifests, the AC unit will prematurely fail and be unable to supply the necessary electricity for the AC unit to operate, and the AC units will not be able to blow cool air as expected. In order to restore the functionality of the AC unit, the end purchaser must purchase new capacitors and have them installed by a professional. Upon information and belief, the Defect is limited to foreign-made capacitors used by Defendants in their Amana AC units.

4. Daikin promotes that "Amana brand central air conditioning systems are designed to be perfect for any home."[1] Further, Daikin states that the Amana brand's top priority is "reliable and long-lasting performance."[2]

5. However, upon information and belief, Daikin sold defective air conditioning units to consumers. In particular, the capacitors within the Amana air conditioning units are prone to premature failure.

6. Defendants knew the capacitors in Amana air conditioning units were defective because the capacitors in those units were failing at rates that far exceeded the industry average.

7. Defendants were also aware that the capacitors in the Amana air conditioning units were defective because it received, and continues to receive, complaints from consumers and air conditioning service technicians that the Amana air conditioning units contain defective capacitors that improperly and prematurely fail.

---

[1] https://www.amana-hac.com/products/air-conditioners (last visited July 1, 2024).
[2] https://www.amana-hac.com/about-us (last visited July 1, 2024).

8. Thus, Defendants knew, or reasonably should have known, that the capacitors in its Amana air conditioning units were defective but they have failed or refused to inform their customers, issue a recall, or provide purchasers with non-defective capacitors.

9. Instead, Defendants have falsely and deceptively represented on the Amana website that the Amana brand is reliable, durable, dependable, and long lasting, and that Daikin's manufacturing processes and the quality of its AC units either meet or exceed the highest standards in the heating and cooling industry.

10. Accordingly, Plaintiffs, on behalf of themselves and all others similarly situated, bring this action for violations of the Texas Deceptive and Unfair Trade Practices Act, Oklahoma Consumer Protection Act, Magnuson-Moss Warranty Act, fraudulent concealment, negligent misrepresentation, breach of implied warranty, breach of express warranty, and unjust enrichment.

## PARTIES

**Plaintiff Big State Air Conditioning and Heating Company**

11. Plaintiff Big State Air Conditioning and Heating Company ("Big State") is an HVAC service company incorporated in Texas with its principal place of business at 17170 Lonestar Road, Waller, TX 77484.

12. As part of Big State's business as an HVAC service company, Big State services air conditioning units manufactured by Defendants.

13. Over the past several years, Big State has serviced approximately one hundred of Defendants' air conditioning units.

14. A typical service visit includes two components: labor and parts. When called to a customer's home to service a failed capacitor, Big State will charge the customer for the

replacement capacitor (if out of warranty) as well as for the labor in traveling to the customer and having an experienced technician perform the replacement.

15. After servicing Defendants' units, Big State's practice was to submit a claim under Defendants' warranty. Defendants would then send Big State the same defective capacitor that would inevitably fail again shortly after replacement.

16. To better serve its customers, Big State stopped replacing Defendants' capacitors with the replacement capacitors they supplied because the capacitors would fail again and lead to customer dissatisfaction. As such, Big State began recommending the installation of a non-defective, American-made capacitor. After Big State began swapping out Defendants' failed capacitors with American-made capacitors, Big State has not received any follow up service calls based on the American-made capacitors failing.

17. The cost for Big State for a service visit and to supply an America-made capacitor is approximately $429. To help its customers and aid in customer retention, Big State has reduced its pricing to approximately $148. As such, Defendants' defective capacitors have cost Big State $281 per visit in revenue.

18. On or about December 17, 2024, Plaintiff Big State sent a presuit demand letter to Defendants.

19. Plaintiff has suffered an ascertainable loss as a result of Defendants' omissions associated with the Defect, including, but not limited to, out of pocket losses associated with diagnosing and remedying the Defect for its customers. As described above, Plaintiff has lost time and money by installing Defendants' capacitors with American-made capacitors that are not defective.

20. Neither Defendants, nor any of their agents, dealers, or other representatives informed Plaintiff of the existence of the Defect.

**Plaintiff Aaron Cissell**

21. Plaintiff Aaron Cissell is a citizen of Oklahoma who currently resides in Tulsa, Oklahoma, and has at all times pertinent to this Complaint.

22. Plaintiff Cissell purchased two identical 2-ton and one 5-ton Amana air conditioning units in late 2021 from Evans Mechanical, an authorized retailer located in Tulsa, Oklahoma. The units were installed in early 2022, with the final inspections taking place in May.

23. Plaintiff Cissell purchased (and still owns) these units, which are used for personal and household use. His air conditioning units bear the serial numbers: 2007108372, 2008044341, and 2102716065.

24. Prior to purchase, Plaintiff Cissell visited Defendants' website and reviewed the website pages for the specific units that Plaintiff purchased. The website did not disclose the defective nature of the units.

25. In or about July to September of 2022, Plaintiff Cissell noticed that one of the units, number 2007108372, began to randomly shut off and that power cycling was required to get the unit to power back on.

26. In September 2022, Plaintiff Cissell made a service call to Air Repair Heating & Cooling ("ARHC"). ARHC was not able to resolve the issue at that time.

27. Later, on July 18, 2023, when Plaintiff Cissell noticed that units #2007108372 and #2008044341 were shutting off intermittently, he made another service call to ARHC. Once again, ARHC was not able to resolve the issue. Plaintiff Cissell made an additional service call on August 16, 2023, after he noticed the failures in both units had worsened. Still, no resolution was reached.

28. In June of 2024, Plaintiff Cissell made a service call to Air Comfort Solutions ("ACS") for the same issues in both air conditioning units. On June 5, a "04" Error Code appeared, indicating that the condenser control boards of both units had a "Locked Rotor." One of the units additionally displayed the "05" Error Code for "Fuse Open." Two days later, on June 7, 2024, when Plaintiff Cissell made another service call to ACS for the same problems, ACS contacted Amana Tech Support to discuss the error codes further. At that time, Amana informed ACS that the error code displayed was related to a problem with the compressor and indicated there may be a manufacturer defect or design flaw since they had received multiple reports of similar concerns from other consumers.

29. Shortly after, Plaintiff Cissell made a service call to Quick Temp Heat and Air ("Quick Temp") on June 17, 2024. Quick Temp replaced the shot run capacitators in all three units under Plaintiff Cissell's warranty. Quick Temp additionally added hard start kits to each unit for a total of $585.75, which Plaintiff Cissell paid for out of pocket, in order to eliminate the 04 Error Code. Plaintiff Cissell had no choice but to pay for the repairs because he needed working air conditioning units.

30. On June 25, 2024, Plaintiff Cissell began to notice a lot of humidity, so he made a service call to Quick Temp. During that visit, Quick Temp added the dehumidification option to the control board.

31. In August of 2024, Amana prescribed both an update and a board replacement for Plaintiff Cissell's air conditioning unit #2008044341. At that time, Plaintiff Cissell noticed that unit #2007108372 had stopped experiencing the abrupt shut down issue, but still did not sound right when it was on and running.

32. Shortly after, Plaintiff Cissell noticed that the compressor in unit #2008044341 had stopped operating. Plaintiff made a service call to Quick Temp on October 21, 2024. Quick Temp found that the compressor had shorted and melted the plugs, causing the unit to catastrophically fail, and estimated that the repair costs would be approximately $1,600. Once again, Plaintiff Cissell had no choice but to pay for the repairs because he needed working air conditioning units.

33. In April of 2025, Plaintiff Cissell experienced yet another compressor failure in unit #2007108372. The total repair costs were $1,629.24, which Plaintiff was forced to pay because he needed working air conditioning units.

34. On or about April 11, 2025, Plaintiff Cissell sent a presuit demand letter to Defendants.

35. Plaintiff Cissell has suffered an ascertainable loss as a result of Defendants' omissions associated with the Defect, including, but not limited to, out of pocket loss associated with the Defect and diminished value of his air conditioning units.

36. Neither Defendants, nor any of their agents, dealers, or other representatives informed Plaintiff of the existence of the Defect prior to purchase. Had Defendants disclosed the Defect to Plaintiff Cissell, he would not have purchased the air conditioning units, or would have paid less for them.

**Defendants**

37. Defendant Daikin Comfort Technologies North America, Inc. ("Daikin") is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at Daikin Texas Technology Park, 19001 Kermier Road, Waller, Texas 77484. Daikin is a wholly-owned subsidiary of Daikin Industries, Ltd., a corporation organized and existing under the laws of Japan.

38. Defendant Goodman Company, L.P. ("Goodman") is a limited partnership organized and existing under the laws of the State of Delaware. Goodman is headquartered at 5151 San Felipe, Suite 500, Houston, Texas 77056.

39. Daikin, doing business as the Amana Corporation, designs, manufactures, and sells central air conditioning units under the trade name Amana®. The Amana Corporation is headquartered at 553 Benson Road, Benton Harbor, Michigan 49022. Amana brand air conditioning systems are engineered and manufactured at the Daikin Texas Technology Park located at 19001 Kermier Road, Waller, Texas 77484. Contained within this 4.2 million square foot facility are "the Amana brand's manufacturing, engineering, logistics, and customer support."[3]

40. In 1997, Goodman Global, Inc. ("Goodman Global") acquired Amana Corporation from Raytheon Appliances. In 2002, Goodman Global separated its HVAC division from its appliances business and sold the appliances business to Maytag Corporation and retained the air conditioning and furnace business. In 2012, Defendant Daikin acquired Goodman Global along with the Amana HVAC brand.

## JURISDICTION AND VENUE

41. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one Plaintiffs and Defendant are citizens of different States.

[3] https://www.amana-hac.com/about-us/amana-locations (last visited July 1, 2024).

42. This Court has personal jurisdiction over the Defendants because they conduct substantial business in the District and intentionally and purposefully offered services within the District. Furthermore, a substantial part of the acts and omissions complained of occurred in the District. Defendants are both entities formed under Delaware law and are thus subject to general jurisdiction within Delaware.

43. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because the Defendants received substantial revenue and profits from their sales of Amana air conditioning units in this District. Therefore, a substantial part of the events or omissions giving rise to the claims occurred in this District.

## TOLLING OF STATUTE OF LIMITATIONS

44. Any applicable statute(s) of limitations has been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiff and members of the Class could not have reasonably discovered the true, latent nature of the defect until shortly before this class action litigation was commenced.

45. Defendants were and remain under a continuing duty to disclose to Plaintiffs and members of the Class the true character, quality, and nature of the Amana brand air conditioning units. As a result of the active concealment by Defendants, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## FACTUAL ALLEGATIONS

### Air Conditioning Capacitors

46. Air conditioning units are high-energy appliances that depend on an electrical device called a capacitor to deliver the necessary power. The capacitor stores electricity and provides the initial, powerful jolt of electricity to kickstart the key components of the A/C units,

including the compressor and the condenser fan motor.[4] An exemplar photograph of a capacitor (circled in green) is included below.



47. When the air conditioner kicks on, the capacitor releases electricity to help the compressor and fans start up.

48. Once the air conditioner unit is powered on, the capacitor is also responsible for maintaining a consistent voltage to the compressor to ensure the A/C unit has sufficient power to ensure the motor continues to operate.

---

[4] https://www.trane.com/residential/en/resources/blog/air-conditioner-capacitors-what-they-are-and-why-theyre-such-a-big-deal/ (last visited July 9, 2024)

49. The capacitor itself contains dielectric oil and two conductive plates which are separated by a dielectric material.

50. When the capacitor is engaged, it generates heat. The purpose of the oil is to dissipate the heat and provide insulation. If the oil is of a low-quality and unable to sufficiently dissipate the heat generator when the capacitor is running, it will lead to premature capacitor failure.

51. Signs of a defective or failing capacitor include: the air conditioning unit does not start; the air conditioning system shuts off on its own; no cold air is produced despite the air conditioning unit running; the air conditioning unit emits an unusual humming noise during operation; the air conditioning unit produces smoke or a burning smell; and energy bills are unreasonably high.[5]

52. Without a properly functioning capacitor, the air conditioning unit is unable to operate properly, rendering it unfit for its ordinary purpose and leaving consumers without a fully functioning air conditioning system.

53. When a capacitor fails to function properly, service by a licensed technician is necessary. Capacitors are high-voltage devices that store electricity and could cause serious physical harm, even if the power is turned off. As such, consumers are discouraged from repairing and replacing capacitors on their own. Instead, consumers are instructed to contact licensed air conditioning service companies when their air conditioning units demonstrate signs of improperly functioning capacitors.[6]

---

[5] *Id.*
[6] *Id.*

54. Repairs and/or replacements that eliminate the capacitor defect contained in Amana brand air conditioning systems/units are extremely costly, causing further injury to consumers and Plaintiff as alleged herein.

**Amana Heating and Cooling**

55. The models of air conditioning units at issue were designed and manufactured by Daikin and sold under the trade name Amana®.

56. Daikin promotes the Amana brand as "synonymous with long-lasting, premium quality products."[7]

57. Daikin further touts that "the Amana brand provides strong limited product warranty coverage for a reason. We build our products to provide lasting performance. We test each Amana brand product, including an actual run test, before it leaves the assembly line."[8]

58. Daikin states that Amana brand air conditioning units are tested to ensure compliance with quality and safety standards:

> At the factories that produce Amana brand products, we have labs that help ensure we produce an industry leading product.
>
> For instance, in our cooling facility, we have a production lab that we inspect and test units. In this lab, we can test up to 1% of our daily production to ensure that it complies with our quality and safety standards. This is higher than what the standard, entitled ISO 9001, required of a manufacturing facility.
>
> ISO 9001 is a quality management system. It allows Amana brand products to be inspected to ensure that they are defect free when leaving our factory. Moreover, it allows us a mechanism to correct any defects that are identified as part of the inspection process.
>
> As part of this quality management system this lab uses critical component tracking. Critical component tracking is when each unit is scanned. This allows us to validate that critical components, such as compressors, are correctly put into the intended unit.
>
> In addition to our quality management system, we also use a quality audit system for the managers themselves. On a regular basis, managers of the factory, including line

[7] https://www.amana-hac.com/about-us/tried-and-true2 (last visited July 3, 2024)
[8] *Id.*

> supervisors, lead persons, paint operators and more, all meet in the lab. Units are then reviewed by the entire factory team to discuss what modifications, if any, to the production system can lead to a better quality product. Our quality processes are engineered to validate that the product leaving this factory is of the standard that is expected by our Amana brand dealers and homeowners who put their trust in the Amana brand.[9]

**Air Conditioning Defect**

59. According to the U.S. Department of Energy, "[t]he 'lifespan' of a central air conditioner is about 15 to 20 years."[10]

60. As one of the critical components of an air conditioning unit, the capacitor must be capable of lasting for the lifetime of the unit, which is at least 15 to 20 years.

61. Capacitors, just like the air conditioning system as a whole, must be designed and manufactured to withstand high temperatures, including high ambient temperatures during summer months when air conditioning is most needed.

62. The air conditioning units sold by Defendants suffer from one or more defects that result in sudden and unexpected failure, leaving the units unable to operate without replacing the capacitors, which is a costly repair.

63. Specifically, the capacitors utilized by Defendants are defective because the substandard oil used is insufficient to properly cool the capacitors. Upon information and belief, the oil used in Defendants' capacitors is substandard and overheats and, as a result, degrades and thins out during normal thermal cycling (i.e. operating of the capacitor and air conditioner unit).

64. Substandard oil, a hallmark of cheap, foreign-made capacitors, is done to reduce manufacturing costs and increase profit margins.

65. Once the oil within the capacitor degrades, its ability to cool the capacitors is impaired and causes the capacitor to overheat.

---

[9] https://www.amana-hac.com/quality (last visited July 9, 2024)
[10] https://www.energy.gov/energysaver/central-air-conditioning (last visited July 3, 2024)

66. Once the capacitor overheats, it causes the dielectric material within the capacitor to degrade and/or melt, which causes the inability of the capacitor to hold a charge, causing it to permanently fail, which then leads to a total failure of the air conditioning system as a whole.

**Consumer Complaints**

67. Defendants are on notice of the Defect contained within its Amana brand air conditioning systems by several consumer complaints on the Amana website. Indeed, the internet is replete with examples of blogs and other websites where Class Members have complained of the exact same Defect in their air conditioning systems. A sampling of those complaints is included below:

★★☆☆☆ **Hot in LA** · 6 years ago

**Had some problems**

( year old 5 ton AC used infrequently failed. Having service performed. Could be capacitor or compressor. Should be more reliable

**No**, I do not recommend this product.

**11**

★☆☆☆☆ **Munchy** · 4 years ago

**Not cool enough**

My house is not cooling off the way it is supposed to...we have had the dealer out 2x and it is still not fixed. My old AC worked better at cooling my house down prior to the day it died

**I really like the:** Quietness

**No**, I do not recommend this product.

12

[11] https://www.amana-hac.com/products/air-conditioners/16-seer-asx16 (last visited June 5, 2024)
[12] https://www.amana-hac.com/products/air-conditioners/13-seer-anx13 (last visited June 5, 2024)

★☆☆☆☆ **Anonymous** · 8 months ago

**bad product**

very bad quality compressor quit after 3 months do not recomend this product

**I really like the:** Reputation

**No**, I do not recommend this product.

[13]

★☆☆☆☆ **Jason Louisiana** · a month ago

**BEWARE!**

Strongly not recommended, poorly made. Within first year capacitor failed. After four years coil failed. Replacement coil failed after four years. BEWARE, Dealer did not register the product, so although my paperwork indicates that my parts warranty is supposed to be 10 years, they only give five years. Also compressor and heat exchanger were supposed to be Lifetime Warranty, they only give 5 years. Even if the parts were honored, (replacement coil is $961. wholesale), you are still left with major labor cost and freon cost.

**No**, I do not recommend this product.

[14]

★☆☆☆☆ **Estela** · 3 years ago

**Problems at 3 weeks**

I am having parts replaced due to A/C not working after 3 weeks of purchase

**No**, I do not recommend this product.

[15]

---

[13] https://www.amana-hac.com/products/air-conditioners/13-seer-asx13 (last visited July 5, 2024)
[14] https://www.amana-hac.com/products/air-conditioners/16-seer-asxc16 (last visited July 5, 2024)
[15] *Id.*

**Walt 61** · 6 years ago

**Terrible Experience with AMANA air conditioner**

I had 2 new unit installed in my home and both TXV valves were faulty and had to be replaced for the evaporative coil. A few days later, I found out the that the newly replaced TXV valves were also faulty and now need to be replaced again. Now, one of the compressor motors is vibrating the wall and noisy at night awakening me from sleep in the bedroom. What a nightmare. It is still not repaired yet. Think twice about spending all that money on an AMANA. Not happy at all at this time.

[16]

**Steve239** · 6 years ago

**Continuous Maintenance Required**

I bought this unit as part of a new home package. One week after closing the unit did not work. Technician replaced 2 valves that were leaking. Three weeks later unit did not work again. Technician replaced something on the High side. One month later unit did not work and need more parts. Since that time the capacitor has been replaced 2 times. The unit is 3 1/2 years old. Very disapointed feel it is a Lemon.

**I really like the:** Efficiency

**No**, I do not recommend this product.

[17]

**SB123** · 6 years ago

**Cools well, but lots of noise and vibration**

I had my unit installed 4 months ago. When the weather got hot enough to test and permit the unit, the loud noise and vibrations were very evident. Despite many requests that the installer fix it, small adjustments have not resolved the problems. We are awaiting an Amana Rep to inspect the job and resolve the problems. Not happy with the unit as it stands now. Very frustrated.

**No**, I do not recommend this product.

[18]

**Bgconsul** · 11 months ago

**Not up to rating**

After 3.5 years - top residential unit overheated and compressor needed permanent booster to kick over going forward - no replacement unit considered despite these shortcomings - what will fail next ?

**I really like the:** Dealer Service

**No**, I do not recommend this product.

[19]

---

16 *Id.*
17 *Id.*
18 *Id.*
19 *Id.*

**Defendants' Deficient Warranty Practices**

68. Defendants provide a written warranty for every air conditioning system. Defendants tout the warranty as the "best standard warranty protection" on the market.[20]

69. Indeed, Defendants promote the warranty protection as "Amana brand's 70+-year promise to homeowners to build a product that Lasts and Lasts and Lasts®."[21]

70. Defendant Daikin provides warranty coverage on Amana brand air conditioning units. The warranty coverage is as follows:[22]

> Without any action, an Amana brand air conditioner comes with a 5-year parts limited warranty. But when you register your new Amana brand unit and meet certain predefined conditions, your air conditioner will qualify for additional enhanced warranty coverage.
>
> With predefined registration conditions, Amana brand will furnish a 10-year parts limited warranty that provides replacement part(s) for any part that is found to be defective due to workmanship or materials under normal use and maintenance. With predefined registration conditions, select high-efficiency models include a lifetime unit replacement limited warranty** and lifetime compressor limited warranty** (good for as long as you own your home).

71. The warranty further provides that "Daikin will furnish a replacement part, without charge for the part only, to replace any part that is found to be defective due to workmanship or materials under normal use and maintenance during the warranty period."[23]

72. However, when consumers, including Plaintiff Cissell, experience the Defect within the warranty period, Daikin refuses to provide warranty coverage. As a result, consumers, including Plaintiff Cissell, are forced to pay out-of-pocket expenses to repair and/or replace Defendants' defective units.

---

[20] https://www.amana-hac.com/support/standard-warranty (last visited July 5, 2024)
[21] https://www.goamana.com/standard-warranty.html (last visited July 5, 2024)
[22] https://www.amana-hac.com/resources/hvac-learning-center/limited-warranty/get-peace-of-mind-with-an-air-conditioner-limited-warranty (last visited July 5, 2024)
[23] https://www.amana-hac.com/pdfviewer.aspx?pdfurl=docs/default-source/warranty-certs-2023/pwaachplw.pdf?view=true ("Warranty"), at 2 (last visited July 5, 2024)

## CLASS ALLEGATIONS

73. Plaintiffs bring this action, individually, and on behalf of a class of similarly situated businesses and consumers, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

> **Consumer Class.** Any person in the United States who purchased an Amana brand HVAC system/unit.
>
> **HVAC Class.** Any HVAC technician or HVAC business in the United States that installed and investigated, diagnosed, repaired, and/or replaced capacitors in Amana brand HVAC systems/units.

(together identified herein as "the Class").

Excluded from the Class are: (a) Defendant; (b) Defendant's affiliates, agents, employees, officers and directors; and (c) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family. Plaintiff reserves the right to modify, change, or expand the various class definitions set forth above based on discovery and further investigation.

74. **Numerosity**: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identity of individual members of the Class are unknown at this time, such information is in the sole possession of Defendants and obtainable by Plaintiff only through the discovery process. Plaintiffs believe, and on that basis allege, that the Class consists of several thousand similarly situated businesses and consumers. The number and identity of Class members can be determined based on Defendants' records.

75. **Commonality**: Common questions of law and fact exist as to all members of each Class. These questions predominate over questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a. Whether the Amana brand air conditioning units are defective;

b. Whether Defendants knowingly failed to disclose the existence of the defect;

c. When Defendants first learned that their units were defective;

d. Whether Defendants violated their warranty;

e. Whether Defendants knowingly misled Plaintiffs and the Class; and

f. Whether Defendants were unjustly enriched by selling defective HVAC units that did not function as represented; and

g. Whether the Class is entitled to damages or other relief.

76. **Typicality**: Plaintiffs have the same interest in this matter as all Class members, and Plaintiffs' claims arise out of the same set of facts and conduct as the claims of all Class members. Plaintiffs and the Class members' claims all arise out of Defendants' uniform conduct and statements.

77. **Adequacy**: Plaintiffs have no interests that conflict with the interests of the Class, and are committed to pursuing this action vigorously. Plaintiffs have retained counsel competent and experienced in complex consumer class action litigation. Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the Class.

78. **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class members. The injury suffered by each individual Class member is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for Class members individually to effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation increases the delay and expense to all parties, and to the court

system, presented by the complex legal and factual issues of this case. Individualized rulings and judgments could result in inconsistent relief for similarly situated individuals. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES CONSUMER PROTECTION ACT
### (on behalf of Plaintiff Big State and the HVAC Class)

79. Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

80. Plaintiff Big State is a "person" as defined by Tex. Bus. & Com. Code § 17.45(3). The HVAC units are "goods" under Tex. Bus. & Com. Code § 17.45(1). Plaintiff Big State and members of the HVAC Class are "consumers" as defined in Tex. Bus. & Com. Code § 17.45(4). Defendants have at all relevant times engaged in "trade" and "commerce" as defined in Tex. Bus. & Com. Code § 17.45(6), by advertising, offering for sale, selling, and/or distributing the HVAC units in Texas, directly or indirectly affecting Texas citizens through that trade and commerce.

81. The allegations set forth herein constitute false, misleading, or deceptive trade acts or practices in violation of Texas's Deceptive Trade Practices Consumer Protection Act ("DTPA"), Tex. Bus. & Com. Code § 17.41, *et seq.*

82. By failing to disclose and actively concealing the defects in Amana brand HVAC units, Defendants engaged in deceptive business practices prohibited by the DTPA, including (1) representing that the HVAC units have characteristics, uses, benefits, and qualities which they do not have, (2) representing that the HVAC units are of a particular standard, quality, and grade when they are not, (3) advertising HVAC units with the intent not to sell them as advertised, and

(4) engaging in acts or practices which are otherwise unfair, misleading, false or deceptive to consumers.

83. As alleged above, Defendants made material statements about the benefits and characteristics of the Amana brand HVAC units that were either false or misleading. These statements contributed to the deceptive context of Defendants' unlawful advertising and representations as a whole.

84. Defendants knew that the HVAC units were defectively manufactured, would prematurely fail, and were not suitable for their intended use. Defendants nevertheless failed to warn Plaintiff Big State and the Class about these defects despite having a duty to do so.

85. Defendants owed Plaintiff Big State and the Class a duty to disclose the defective nature of the HVAC units because they:

a. Possessed exclusive knowledge of the defects rendering the HVAC units more unreliable than similar HVAC units;

b. Intentionally concealed the defects associated with the HVAC units through Defendants' deceptive advertising and marketing that they designed to hide the defects in the units; and/or

c. Made incomplete representations about the characteristics and performance of the HVAC units generally, while purposefully withholding material facts from Plaintiff Big State and the Class that contradicted these representations.

86. Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Big State and the Class, about the true performance and characteristics of the HVAC units.

87. Defendants' intentional concealment of and failure to disclose the defective nature of the HVAC units to Plaintiff Big State and the Class constitutes an "unconscionable action or course of action" under Tex. Bus. & Com. Code § 17.45(5) because, to the detriment of Plaintiff Big State and the Class, that conduct took advantage of their lack of knowledge, ability, and experience to a grossly unfair degree. That "unconscionable action or course of action" was a producing cause of the economic damages sustained by Plaintiff Big State and the Class.

88. Defendants are also liable under Tex. Bus. & Com. Code § 17.50(a) because their breach of the implied warranty of merchantability set forth herein was a producing cause of economic damages sustained by Plaintiff Big State and the Class.

89. As a result of their violations of the DTPA detailed above, Defendants caused actual damage to Plaintiff Big State and the Class and, if not stopped, will continue to harm them. Plaintiff Big State and the Class currently own, or within the class period have owned, repaired and/or replaced, or within the class period have repaired and/or replaced, defective HVAC units at their expense.

90. All procedural prerequisites, including notice, have been met. The giving of notice to Defendants is rendered impracticable pursuant to Tex. Bus. & Com. Code § 17.505(b) and unnecessary because Defendants have notice of the claims against them through the numerous complaints filed against them. Pursuant to Tex. Bus. & Com. Code § 17.505(b), Plaintiff Big State, individually and on behalf of the Class, will send to the Texas Consumer Protection Division a copy of this Complaint.

91. Plaintiff Big State and the Class have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful, and/or deceptive practices. In purchasing, repairing, and/or replacing defective HVAC units, Plaintiff Big State and the HVAC

Class relied on the misrepresentations and/or omissions of Defendants with respect to the quality and reliability of the units. Defendants' representations were untrue because their HVAC units were manufactured and sold with the Defect. Had Plaintiff Big State and the Class known this, they would not have purchased their HVAC units and/or paid as much for them. Accordingly, Plaintiff Big State and the Class overpaid for the HVAC units and did not receive the benefit of their bargain.

92. Plaintiff Big and the Class sustained damages as a result of Defendants' unlawful acts and are, therefore, entitled to damages and other relief as provided under the DTPA.

93. Plaintiff Big State and the Class should be awarded three times the amount of their economic damages because Defendants intentionally concealed and failed to disclose the defective nature of the HVAC units.

94. Plaintiff and the HVAC Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the DTPA.

## COUNT II
## VIOLATIONS OF THE OKLAHOMA CONSUMER PROTECTION ACT
## (on behalf of Plaintiff Cissell and the Consumer Class)

95. Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

96. Oklahoma's Consumer Protection Act (the "OCPA") prohibits a company from making false representations and engaging in unfair or deceptive trade practices designed to sell the company's products. In relevant part, the OCPA provides that: A person engages in a practice which is declared to be unlawful under the [OCPA] when, in the course of the person's business, the person . . . [m]akes a false or misleading representation, knowingly or with reason to know, as

to the characteristics, ingredients, uses, benefits, alternations, or quantities of the subject of a consumer transaction . . . [or] [c]ommits an unfair or deceptive trade practice as defined in Section 752 of this title." Okla. Stat. tit. 15 §§ 753(5) & (20).

97. Defendants are "persons" under the OCPA, as the term is defined broadly to include any "natural person, corporation, trust, partnership, incorporated or unincorporated association, or any other legal entity." *Id.* § 752(1).

98. Defendants' sale of the AC Units to Plaintiff Cissell and members of the Consumer Class are "consumer transactions," which the OCPA defines as the "advertising, offering for sale or purchase, sale, purchase, or distribution of any services or any property, tangible or intangible, real, personal, or mixed, or any other article, commodity, or thing of value wherever located, for purposes that are personal, household, or business oriented." *Id.* § 752(2).

99. In the course of Defendants' business, Defendants intentionally or negligently concealed and suppressed material facts concerning the Defect.

100. Defendants thus violated the provisions of the OCPA, at a minimum by: (1) representing that the capacitors have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the capacitors are of a particular standard, quality, and grade when they are not; (3) advertising the capacitors with the intent not to sell them as advertised; (4) failing to disclose information concerning the capacitors with the intent to induce consumers to purchase the capacitors.

101. Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the OCPA by failing to disclose and/or actively concealing the Defect, by marketing their capacitors and air conditioning systems as reliable and high quality, and by presenting themselves as a reputable manufacturers that that stood behind their products after they were sold.

102. As alleged above, Defendants have known of the Defect for years. Prior to selling the air conditioning systems and/or capacitors, Defendants knew or should have known the capacitors suffered from the Defect. Defendants, nevertheless, failed to disclose and actively concealed the Defect.

103. Defendants owed Plaintiff and the Consumer Class a duty to disclose the Defect because Defendants possessed exclusive knowledge of the Defect, intentionally concealed the Defect, and purposefully withheld material facts about the Defect.

104. Defendants' unfair and deceptive trade practices were likely intended to deceive a reasonable consumer. Plaintiff and members of the Consumer Class had no reasonable way to know that the capacitors suffered from the Defect, were defective in workmanship and/or manufacture. Defendants possessed superior knowledge as to the quality and characteristics of the capacitors, including the Defect, and any reasonable consumer would have relied on Defendants' misrepresentations and omissions, as Plaintiff and members of the Consumer Class did.

105. Plaintiff and Consumer Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the Consumer Class members who purchased the air conditioning systems and/or capacitors and would not have purchased them at all or would have paid significantly less for them.

106. 727. Defendants had an ongoing duty to all customers to refrain from unfair and deceptive practices under the OCPA in the course of their business.

107. Defendants' violations present a continuing risk to Plaintiff and the Consumer Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

108. 729. Pursuant to Okla. Stat. Tit. 15 § 761.1, Plaintiff and the Consumer Class seek an order enjoining Defendants' unfair and/or deceptive acts or practices, damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the OCPA.

**COUNT III**
**FRAUDULENT CONCEALMENT**
**(on behalf of Plaintiffs and the Classes)**

109. Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

110. Defendants fraudulently concealed the defects in their Amana brand HVAC units.

111. Defendants knew the capacitors contained in the HVAC units were defective because of, among other things, the numerous public complaints they received claiming that their HVAC units were suffering from defective capacitors and their own research and testing of HVAC units.

112. Defendants had a duty to disclose any defect in their HVAC units. Defendants knew of the harm created by defective capacitors. Indeed, Defendants' testing revealed or should have revealed the harms that the defective capacitors would cause. Thus, Defendants knew that, should they make available for purchase defective HVAC units that prematurely fail, Plaintiffs and the Class would suffer harm.

113. Defendants, however, concealed the capacitor defects in the HVAC units that caused the units to prematurely fail. Defendants represented that they "test each Amana brand product, including an actual run test, before it leaves the assembly line."

114. When Defendants' HVAC units prematurely fail, Defendants put the blame on homeowners and technicians. Defendants deny warranty coverage to homeowners and technicians.

Defendants never state that the problem may be a defect in the capacitor that causes the HVAC units to prematurely fail.

115. The defects Defendants concealed were material. Plaintiffs and the Class would not have purchased HVAC units that failed to perform their essential purpose and caused them to repeatedly and prematurely fail.

116. Plaintiffs and the Class were not on actual or constructive notice of the defect, in part, because of Defendants' representations that any failure of the capacitor and/or the HVAC unit itself was not due to Defendants, but incorrectly due to the fault of the homeowner or technician.

117. Defendants' fraudulent concealment of defects in the capacitors caused Plaintiff's injuries. Plaintiff Big State and the Class suffered harm investigating, diagnosing, repairing and/or replacing the defective capacitors in the HVAC units.

118. Plaintiffs and the Class, therefore, seek all remedies available to them for Defendants' fraudulent concealment.

**COUNT IV**
**NEGLIGENT MISREPRESENTATION**
**(on behalf of Plaintiffs and the Classes)**

119. Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

120. Defendants negligently mispresented that the capacitors contained in the HVAC units were of the highest quality, standard, and reliability in the market.

121. Defendants knew or should have known that the capacitors contained in the HVAC units were defective because of, among other things, the numerous public complaints they received

claiming that their HVAC units were suffering from defective capacitors and their own research and testing of HVAC units.

122. Defendants had a duty not to misrepresent as to the quality and functionality of the capacitors contained within the HVAC units. Defendants knew or should have known of the harm created by defective capacitors. Indeed, Defendants' testing revealed or should have revealed the harms that the defective capacitors would cause. Thus, Defendants knew or should have known that they make available for purchase defective HVAC units that prematurely fail, Plaintiffs and the Class would suffer harm.

123. Defendants, however, concealed the capacitor defects in the HVAC units that caused the units to prematurely fail. Defendants represented that they "test each Amana brand product, including an actual run test, before it leaves the assembly line."

124. When Defendants' HVAC units prematurely fail, Defendants put the blame on homeowners and technicians. Defendants deny warranty coverage to homeowners and technicians. Defendants never state that the problem may be a defect in the capacitor that causes the HVAC units to prematurely fail.

125. The defects Defendants concealed were material. Plaintiffs and the Class would not have purchased HVAC units that failed to perform their essential purpose and caused them to repeatedly and prematurely fail.

126. Defendants' negligent misrepresentations regarding the capacitors contained in the HVAC units caused Plaintiffs' injuries. Plaintiffs and the Class suffered harm investigating, diagnosing, repairing and/or replacing the defective capacitors in the HVAC units.

127. Plaintiffs and the Class, therefore, seek all remedies available to them for Defendants' fraudulent concealment.

## <u>COUNT V</u>
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## (on behalf of Plaintiffs and the Classes)

128. Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

129. Defendants' capacitors and the HVAC units generally are subject to an implied warranty of merchantability, as defined in U.C.C. § 2-314.

130. "[A] warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." *Id.* at § 2-314(1).

131. To be "merchantable," goods must be "in the case of fungible goods, are of fair average quality within the description[,]" "fit for their ordinary purposes for which such goods are used[,]" "run, within the variations permitted by the agreement, of any kind, quality, and quantity within each unit and among all units involved[,]" and "conform to the promises or affirmations of fact made on the container or label if any" *Id.* at § 2-314(2)(a), (b), (d), (f).

132. As described herein, Defendants' HVAC units, including the capacitors, sold to Plaintiffs and the Class were not of average quality, were not fit for their ordinary purpose, were not within the variations of quality permitted, and did not conform to Defendants' representations.

133. Defendants represented that the HVAC units and the capacitors were of the highest quality, reliable, and functional. To be properly functioning, the capacitor provides the initial, powerful jolt of electricity to the motor of the air conditioner that it needs to start running.

134. Defendants' capacitors, however, contain the Defect which causes the HVAC unit to prematurely fail. As a result, the HVAC units are effectively unusable.

135. Plaintiffs and the Class have found the only solution to the defective capacitors is to repair and/or replace the capacitors with equally defective capacitors, or worse, replace the entire HVAC unit.

136. Defendants' capacitors and/or HVAC units, therefore, do not perform the function they represented and that a capacitor and/or HVAC unit is intended and required to perform.

137. Defendants' breach of the implied warranties of merchantability injured Plaintiffs and the Class in an amount to be determined at trial.

**COUNT VI**
**BREACH OF EXPRESS WARRANTY**
**(on behalf of Plaintiffs and the Classes)**

138. Plaintiffs incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

139. Defendants provided Plaintiffs and the Class with an express warranty for the HVAC units whereby Defendants agreed to furnish a replacement for any part that is found to be defective due to workmanship or materials under normal use and maintenance during the warranty period.

140. The express warranty became part of the basis of the bargain between Defendants and Plaintiffs and the Class.

141. Defendants breached its express warranties by failing to repair or replace the defective capacitors and/or HVAC units.

142. The limitations contained within the express warranty are both substantively and procedurally unconscionable. Defendants' attempt to disclaim or limit these express warranties is unconscionable and unenforceable under the circumstances here. Specifically, the warranty

limitation is unenforceable because Defendants knowingly sold a defective product without disclosing the defect.

143. The time limits contained in the warranty are also unconscionable and inadequate to protect Plaintiffs and the Class. Among other things, Plaintiffs and the Class had no meaningful choice in determining these time limitations the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and Plaintiffs and the Class, and Daikin knew or should have known that the capacitors were defective at the time of sale and would fail well before their useful lives.

144. Plaintiffs provided written notice to Defendants of their breach of express warranties on or about April 15, 2025.

145. Plaintiffs and the Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

146. Plaintiffs and the Class are entitled to legal and equitable relief against Defendants, including damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

## COUNT VII
## VIOLATIONS OF THE MAGNUSON-MOSS WARRANTY ACT ("MMWA")
## (on behalf of Plaintiffs and the Classes)

147. Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

148. Plaintiff and the Class are "consumers" as identified in 15 U.S.C. § 2301(3).

149. Defendants are "suppliers" and "warrantors" as defined in 15 U.S.C. §§ 2301(4) and (5).

150. Defendants' capacitors and/or HVAC units are "consumer products" as defined in 15 U.S.C. § 2301(6). 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

151. 15 U.S.C. § 2304(a)(1) requires Defendants, as warrantors, to remedy any defect, malfunction or nonconformance of the capacitors within a reasonable time and without charge to the Plaintiff and the Class.

152. As described herein, Defendants' capacitors violated the warranty of merchantability because they were not fit to be used as capacitors due to their frequent and premature failure.

153. As a result of Defendants' breaches of warranties, and Defendants' failures to remedy the same within a reasonable time and without charge to Plaintiffs and the Class, Plaintiffs and the Class have suffered damages.

**COUNT VIII**
**UNJUST ENRICHMENT**
**(on behalf of Plaintiffs and the Classes)**

154. Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

155. As described herein, Defendants manufactured and sold capacitors contained within their Amana HVAC units that were not capable of performing the basic, required function of capacitors: to provide the required amount of electrical jolt to the motor that allows the air conditioning unit to run.

156. Defendants generated profits by selling HVAC units containing defective capacitors and/or defective capacitors to Plaintiffs and the Class. Defendants fully knew that their capacitors and/or HVAC units were prone to premature failure. Indeed, Defendants test each and

every HVAC unit. However, Defendants never disclosed that their HVAC units would prematurely fail due to a defect contained in the capacitor.

157. Defendants, therefore, have been knowingly and unjustly enriched at the expense of and to the detriment of Plaintiffs and the Class by collecting excess profits to which Defendants are not entitled.

158. Defendants have unjustly retained those ill-gotten gains and should be required to disgorge this unjust enrichment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully requests that this Court:

A. Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B. Appoint Plaintiffs as the representative of the Class and their counsel as Class Counsel;

C. Award actual damages and equitable monetary relief to Plaintiffs and the Class;

D. Award pre-judgment and post-judgment interest on such monetary relief;

E. Grant appropriate injunctive and/or declaratory relief;

F. Award reasonable attorneys' fees and costs; and

G. Grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiffs, on behalf of themselves and the putative Class, demand a trial by jury on all issues so triable.

Dated: August 5, 2025

Respectfully submitted,

FARNAN LLP

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Fl.
Wilmington, DE 19801
Telephone: (302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiffs*

Of Counsel:

Joseph G. Sauder
Matthew D. Schelkopf
Joseph B. Kenney
SAUDER SCHELKOPF LLC
1109 Lancaster Avenue
Berwyn, PA 19312
Tel: (888) 711-9975
Facsimile: (610) 421-1326
jgs@sstriallawyers.com
mds@sstriallawyers.com
jbk@sstriallawyers.com